# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

Fifth Division – Case Number 20-cv-_____

**Troy K. Scheffler,**

     Plaintiff,

**v.**

**City of Nisswa,**

**Craig Taylor,**
In his individual capacity
for actions under color of law
as City of Nisswa's Chief of Police,

**Conner Collette,**
In his individual capacity
for actions under color of law
as a City of Nisswa Police Officer,
     Defendants.

RECEIVED BY MAIL
OCT 27 2020
CLERK
U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

## COMPLAINT – TRIAL BY JURY DEMANDED

## INTRODUCTION

Following a copious amount of police misconduct within the City of Nisswa under the supervision, leadership, and tutelage of Chief Craig Taylor coupled with the highly publicly unpopular enforcement of the State's Towards Zero Deaths (TZD) on Highway 371 within Nisswa, there began political infighting between Nisswa Mayor Fred Heidmann, members of the council and Chief Taylor.

SCANNED
OCT 27 2020
U.S. DISTRICT COURT MPLS

From on-duty drunken officers to sexual escapades, political cover-ups ensued and finally the drama publicly coalesced on 08/29/2020 with the arrest on 371 of the Mayor for disorderly conduct and obstruction of justice by a Nisswa and Pequot Lakes Police Officer. (18-CR-20-2969 Crow Wing)

Shortly after, Chief Taylor, despite not being the charging agency, edited the bodycam footage of the arrest to ensure the Mayor appeared as poorly as possible to the public and then leaked the video to the media in hopes to unfairly and maliciously damage the Mayor before his upcoming election as he has been stacking the deck in the council with friends and fellow officers.

The media did what they do best, enflamed the public as Taylor had planned.  Taylor has been playing the media since at least 2013 where he hides behind data privacy laws while leaking private data to the media knowing it will be impossible for the public to have access to anything other than Taylor's narratives.

Knowing the video was edited by the Chief, a few politically ambitious council members such as John Ryan (a former Pequot Lakes Police Officer) who is running for the mayor's position, on 09/04/2020,

held a Special Council Meeting to address the Mayor's conduct during the arrest.

Plaintiff saw a notice on YouTube of the incident and instantly knew what was going on after seeing Nisswa and Pequot were involved on 371 as he had been warned 3 years ago when he moved to the area to be very cautious driving there.

Plaintiff then decided to exercise his 1st Amendment right and duty and attended a "Special" Nisswa City Council Meeting to address the mayor's conduct (The Hearing ignored the context and pretext of the incident itself). Since then, he has been retaliated against by the council, Chief Taylor, Officer Conner Collette, others, and this retaliation was even spread by Taylor to the Crow Wing County Sheriff's Department where Plaintiff has suffered further retaliation in Taylor's scorched earth crusade to rid any criticism of him.

Plaintiff now sues for claims of False Imprisonment, Defamation, 1st Amendment Retaliation, 4th Amendment unlawful seizure, 18 U.S. Code § 2724·Drivers Privacy Protection Act (DDPA), MN Government Data Practices Act and Intrusion Upon Seclusion.

## INDIVIDUALS AND PARTIES

1.    Plaintiff Troy K. Scheffler (Scheffler) is an adult man domiciled at 26359 Shandy Trail, Merrifield, MN 56465.

2.    The City of Nisswa (Nisswa) is an incorporated municipal entity and political subdivision located within Crow Wing County, Minnesota having a city hall located at 5442 City Hall St, Nisswa, MN 56468.

3.    Craig Taylor (Taylor) is a Minnesota licensed peace officer employed by the City of Nisswa as Chief of Police.

4.    Conner Collette (Collette) is a Minnesota licensed peace officer employed by the City of Nisswa as Patrol Officer.

5.    Scheffler sues Taylor and Collette in their individual capacities for actions under color of law, as set forth below.

## JURISDICTION AND VENUE

6.    Scheffler states claims that constitute federal questions under 28 U.S.C. §1331 and 18 U.S. Code § 2724.

7.    Scheffler states supplemental claims under Minnesota law under 28 U.S.C. §1367.

8.    Mr. Scheffler lays venue and this division in accordance with 28 U.S.C. §1391 and LR D. Minn. 83.11 because the substantial number of events giving rise to this lawsuit took place in Crow Wing County, Minnesota.

## FACTS

9.    On or about 09/03/2020, Plaintiff became privy by social media notification of an incident which occurred on 08/29/2020.

10.    In said notification was a news release by Lakeland PBS. https://www.youtube.com/watch?v=EMDn5zCJm5k

11.    Being Nisswa is within a few minutes of Plaintiff's home, his curiosity was piqued.

12.    Upon viewing the video, Plaintiff immediately concluded the incident happened on State Highway 371.

13.    This fact was very relevant to Plaintiff as not only has he been warned from the point of moving into the area 3 years prior, but has witnessed copious amounts of police lying in wait to issue petty traffic citations to motorists.

14.    While continuing to view the video, Plaintiff was shown Mayor Fred Heidmann (Heidmann) on foot approaching a Nisswa officer during a traffic stop well within the shoulder area of the roadway.

15.    Up to this point, Plaintiff had never known of or who Fred Heidmann was.

16.    Said officer, while using a fully marked Nisswa police vehicle, was outside the city limits of Nisswa along with a Pequot Lakes officer and fully marked vehicle outside the city limits of Pequot Lakes.

17.    Heidmann inquired to his officer and employee, why a Nisswa officer and vehicle were outside Nisswa.

18.    The Nisswa Officer responded, "We're stopping cars, <u>I don't know why</u> we're stopping him"…

19.    Heidmann then stated that, which is fact, the officers emptying the stopped vehicles contents onto the road and Heidmann.

20.    The officers smugly responded that if Heidmann doesn't like what they're doing, he can talk to their TZD coordinator.

21.    Plaintiff discovered personally this is a fruitless endeavor as he reached out to the TZD program coordinators, Tom Nixon and Kristine Hernandez on 09/11/2020 via email and was ignored by both.

22.    That TZD is a state "grant" shell game program in which police unions pushed its creation that pays officers time and half while misusing municipal tax payers' equipment such as duty gear and patrol vehicles while outside their uniformed and marked jurisdictions.

23.    Publicly, TZD is highly unpopular and serves as a means to hustle money from state taxpayers to then redistribute to local municipalities, to then shake down local taxpayers through the issuance of no quarter petty citations for seatbelts while operating on a quota system all the while the same tax payers are losing jobs and businesses while shoveling money towards police to exercise enforcement of petty offenses that there is no outcry for.

24.    That under information and belief that departments are using the money fraudulently by using the grant to add an officer to perform program directives to instead subsidize a patrol officer who would otherwise be on duty.

25.   That the video shows Nisswa Officer Matthew Thompson directing Heidmann to back away a bit and Heidmann in fact leaves the scene after exchanging a few expletives.

26.   It was later discovered that Taylor had edited the full body camera footage to make the incident look worse that it was and was the one who leaked the video to the media.

27.   Plaintiff later discovered and under information and belief that the officers stopped the initial vehicle for unlawful tint with no device to test the tint making the stop and search itself likely unlawful.

28.   Heidmann was ultimately arrested as shown from a third party Tik Tok video where one of the car's occupants videoing clearly stated he didn't want Heidmann arrested.

29.   Plaintiff concluded that Heidmann could not have been obstructing his own employee outside Nisswa and it is clearly established law that you can't be disorderly to an officer without using "fighting words" which Heidmann never did in the video.

30.   On 09/04/2020 at 4PM, Nisswa held a special council meeting to discuss Heidmann's conduct from the arrest; Gary Johnson being mayor pro tem.

31.   Upon approaching city hall, Plaintiff noticed about 15 uniformed officers from Pequot Lakes, Nisswa, State Patrol, Lake Shore, Cross Lake, and the Crow Wing Sheriff all using city vehicles and equipment outside their jurisdictions.

32.   During the hearing, Gary Johnson spoke first. In his self-righteous monologue, he used hysterics and hyperbole to demand Heidmann step down as mayor.

33.   Next Councilman to speak was Don Jacobson, Jacobson began by stating that in this country we are considered innocent until proven guilty and then hypocritically imputes guilt to Heidmann for failing to appear. He followed by demanding Heidmann's resignation basing it on hyperbole and baseless assertions. He followed by claiming the mayor's actions seriously damaged the city's reputation; a simple Google search easily shows that the police and council have been the ones damaging the city.

34.    Councilman Mike Hoff spoke next and gave praise to the officers involved and also asked Heidmann to resign due to alleged childish behavior for months.

35.    Councilman John Ryan (a former Pequot Lakes Police Officer) began by expressing his sycophantic rhetoric about the police.  He then wraps up with a diatribe of assertions of what could have happened during the Heidmann arrest.  He demanded that Heidmann apologize to every police officer in the universe.  He then gave some bizarre scenario of stopping videos in random traffic stops to assume the cop gets shot every time.

36.    Plaintiff arrived to the podium to speak to the council at 38:50 of their video posted on the Nisswa City Page.

https://www.youtube.com/watch?v=zvxgdrFYDKY&t=2580s

37.    Plaintiff accused the council and police of using this to their political advantage and in the dog and pony show of a council meeting that all the officers armed and uniformed outside their jurisdiction while on duty was not only an inexcusable use of force by executive branch officials dogpiling on a legislative official, but was an extreme

misuse of taxpayer funds as those municipalities expect their police to patrol their communities.

38.  Plaintiff directly called out all the on-duty officers wasting taxpayer funds being at the council meeting purely to impose, meddle and show force against the mayor while leaving their jurisdictions unprotected.

39.  Immediately after Plaintiff left the council chambers, Taylor took the microphone and claimed that "only one officer is on duty" out of the approximately 15 present uniformed officers.  This was a wanton lie as Pequot Lakes themselves had at least 2 officers on duty along with the Chief of Pequot Lakes and Nisswa had 2 officers on duty (Szymanski and Thompson).

40.  Next a woman came up to the podium and referenced Plaintiff, at this time Councilman Gary Johnson (Johnson) interrupted and said while sporting a smug grin, "He left, shocking" implying Plaintiff ran away as a coward.

41.  Shortly thereafter, Captain Joseph Meyer (Meyer) approached the podium stating that he works for Crow Wing County Sheriff.  He stated

that he appeared not as a citizen, but rather a representative of the Sheriff. He too wanted Heidmann to resign.

42.    Pequot Lakes Chief Eric Klang (The charging agency in the Heidmann arrest) approached the podium and thanked those who appeared to show their support for the police and remained neutral with regard to the rest of the situation.

43.    Later, immediately after the meeting, Plaintiff had a discussion with Klang with regard to at least two uniformed police officers from Pequot Lakes being on duty, being paid, using city vehicles, while at a Nisswa Council meeting.

44.    Klang admitted that the two officers were indeed being paid to be there and on duty; putting the lie to Taylor claiming only one officer was on duty.

45.    Maggi Wentler (Wentler), deputy clerk of Nisswa approached the podium and without providing any detail or support asserted that Heidmann bullies her and she needs protection.

46.    Under information and belief, Wentler was involved with other clerks of Cross Lake, Lake Shore, and Pequot Lakes, in sharing

different MNGDPA demands made by Plaintiff to the cities independently in what can only be an attempt at metaphorically firing up the shredders.  At this time, Plaintiff awaits the actual email chain which could implicate others involved.

47.    The council ended with maliciously censuring Heidmann and removing him from all committee posts.

48.    Within minutes of the conclusion of the meeting, at 05:17PM, Taylor went to his office and used equipment and his publicly untrusted security clearance to unlawfully, illegally, and criminally access Plaintiff's personal data in violation of the DPPA.

49.    That Taylor was intimately aware of the DPPA and approved as "Mandatory Policy" controls concerning private data access as referenced in the department's police policy manual Section 5.

50.    That the Council latest adaptation to the policy manual was on in August 2020 and Taylor violated that policy within a month.

51.    That this access was made with willful disregard of the law, maliciously, wantonly, and in retaliation to Plaintiff's Constitutionally

protected 1st Amendment rights expressed by Plaintiff at the 09/04/2020 council meeting.

52.    On 09/05/2020, Plaintiff viewed the council meeting via Nisswa's YouTube page.

53.    Plaintiff noticed the snide comment made by Johnson implying Plaintiff was a coward.  Plaintiff took offense with the comment in its own right, but more so being made at a special meeting to self-righteously, hypocritically berate, and judge Heidmann's "Lack of Professionalism" and Johnson's retaliatory and chilling nature of his comment to the 1st Amendment.

54.    This was the first retaliatory action made after Plaintiff exercised his 1st Amendment right.

55.    On the same day Plaintiff telephoned Johnson to discuss his disparaging comment and left him a voicemail.  He never returned the call.

56.    Plaintiff went to Johnson's home to discuss it as men, Johnson failed to answer his door.

57.    Plaintiff again looked at the council meeting video and noticed a woman berating Plaintiff and leaving numerous vile messages aimed at him and anyone who agreed with what the Plaintiff stated in the meeting.

58.    Plaintiff quickly identified the woman as Angela Sherack, wife of local DNR Game Warden Lt. Chad Sherack.

59.    After noticing Mrs. Sherack that Plaintiff was aware of her husband's official position and didn't appreciate the retaliation, she quickly scrubbed all her comments and locked her social media account.

60.    On 09/07/2020, Plaintiff traveled to Nisswa City Hall and spoke alone with Taylor.

61.    The main take-aways of the meeting were that he was willing to commit a misdemeanor by removing his face mask; that he would not enforce Executive Order 20-81 against government violators; that he stated he was hostile to MNGDPA requests; that he flat out lied to the Plaintiff with regard to asking "every" officer present at the 09/04/2020 meeting if they were on duty and that only one Nisswa officer was.

62.    Klang's admission along with public disclosure shows at least two Pequot Lakes officers, along with others, as Taylor knew, were on duty and present.

63.    That public disclosures prove that two Nisswa officers, on-duty, were present, Szymanski and Thompson.

64.    That Taylor, as <u>MNGDPA designee</u>, again lied to the public concerning the number of officers on duty as both Pequot Lakes and Nisswa later admitted that both cities had two officers at the 09/04/2020 meeting getting paid and on duty; equaling at least four paid officers on duty-Not just one.

65.    That lying as a Chief of Police and as a designee tasked with duty of government transparency is a gross breach of public trust.

66.    That Cross Lake and Lake Shore refuse to honor state law under Plaintiff's MNGDPA demand for disclosure of their officers present on 09/04/2020 and on-duty with city patrol vehicles witnessed and photographed by Plaintiff.

67.    On 09/08/2020, while travelling on Highway 371, Officer Collette was on-duty patrolling in a fully marked Nisswa Patrol Car.

68.     Prior, Taylor had put the word out to his officers that Plaintiff was anti-police and had some sort of agenda so as to justify his officers to harass Plaintiff if he was seen.

69.     While travelling southeast bound on Hillcrest Drive to enter onto Hwy 371, Plaintiff noticed Collette who was in fact familiar with Plaintiff and his vehicle due to Taylor's instruction and that Collette had also attended the meeting on 09/04/2020.

70.     As Plaintiff approached Collette's vehicle, he placed his car in park while knowingly obstructing the lane of traffic Plaintiff was traveling in.

71.     Collette then exited his vehicle intentionally positioning it to prevent Plaintiff to freely travel from his bounded position.

72.     Collette knew that there was a substantial certainty that Plaintiff would be imprisoned in this position.

73.     That Collette approached Plaintiff in full uniform while having his hand on his gun in an intimidating fashion.

74.     Wishing to immediately leave his imprisonment, Plaintiff notified Collette that he was unlawfully blocking traffic (Plaintiff).

75.    Collette then began to accuse and interrogate Plaintiff as to

following him and was "curious" what Plaintiff's "issue" was.

76.    Plaintiff informed Collette he was not free to leave without

breaking traffic laws and placing himself in significant danger by

entering an oncoming lane of traffic which also would be unlawful at

the intersection of 371.

77.    After numerous demands and instructions that the actions of

Collette were unlawful in his stop of Plaintiff, Collette finally conceded

that he would move his car after he felt his intimidation tactics were

failing.

78.    Collette claimed that although he has "parked" in a lane of traffic

at that spot for "years", he has "never had an issue".

79.    Collette has only been an officer for little over one year.

80.    On 09/08/2020, among other requests, Plaintiff made an

MNGDPA demand to the Clerk and Chief of Nisswa as responsible

authorities stating, "...please disclose the body cam, squad camera, or

any other note, report, or recording held by the City of Nisswa involved

in the arrest of Mayor Heidmann and the stop of the individuals which

was the underlying cause of his intervention.  Please disclose the recording system used by your patrol vehicles and body cameras such as ICOP etc."

81.    To date, Nisswa has failed to respond with this data or provide just cause to refrain from its release or any portion thereof. (Taylor had already leaked much of the bodycam footage he edited to the press to paint the narrative he wanted making the data public)

82.    That Nisswa is neither the Prosecuting authority, charging agency, nor did the Heidmann incident happen within the boundaries of Nisswa.

83.    That on 09/08/2020, Plaintiff received a phone call from "Haley" from the Crow Wing County Sheriff's Department to notify Plaintiff that Sheriff Scott Goddard was cancelling that day's meeting that Plaintiff had scheduled with him prior to the 09/04/2020 council meeting and Goddard would be calling back.

84.    That Plaintiff intended to speak with Goddard concerning the inevitable eviction and foreclosure proceedings to be had as a result of

the government destroying countless citizen's livelihoods and futures under the pretext of Covid-19.

85.    That Plaintiff was interested in discovering if Goddard would be enforcing the confiscation of property and the expulsion of citizens on behalf of the government who caused the catastrophic and hysterical response in the first place.

86.    That Goddard initially refused to call Plaintiff back as "Haley" promised.

87.    That only after over a week passed and numerous visits to the Sheriff's Department where each employee was never aware of where Goddard was other than not at the department and numerous phone calls did Goddard muster the courage, decency, and courtesy to contact Plaintiff on 09/16/2020 as he realized Plaintiff was not going to easily be deterred from standing up for Plaintiff's fellow citizens.

88.    That in this conversation, without knowing at all what Plaintiff initially scheduled the meeting for, Goddard informed Plaintiff that he would not be meeting with him because they would not "see eye to eye".

89.    That Goddard informed Plaintiff that this was due to him retaliating against Plaintiff exercising his 1st Amendment at the 09/04/2020 council meeting.  Goddard's attitude was also due to defamatory comments Taylor made to his friend Capt. Joseph Meyer of the Crow Wing Sheriff's Department who in turn spread them to Goddard.

90.    Plaintiff later discovered Goddard and Crow Wing County too had trampled on Plaintiff's privacy by willfully, wantonly, maliciously, and unlawfully violating the DPPA on 09/07/2020 by intruding upon Plaintiff's private data.

91.    That on 09/10/2020, Plaintiff noticed, as usual, a Nisswa patrol car sitting on the side of 371.

92.    Plaintiff approached the vehicle as it was parked blocking a private drive that had a sign stating "No Trespassing".

93.    Plaintiff noticed Nisswa Police Sergeant Todd Szymanski inside the vehicle.

94.    As Szymanski noticed Plaintiff, he refused to acknowledge Plaintiff and had his window up.

95.   As Plaintiff attempted to express a grievance to Szymanski as to his blocking a private drive, he refused to even look at Plaintiff.

96.   That Szymanski was instructed by Taylor to be hostile, degrading, unresponsive to communications which would include emergencies, to Plaintiff in particular more so than general contempt towards the public in an effort to deprive Plaintiff of equal protection in further retaliation to Plaintiff's exercise of his 1st Amendment on 09/04/2020.

97.   That on 09/16/2020, Plaintiff attended the Nisswa City Council regular meeting.

98.   Plaintiff spoke at the meeting which he expressed his grievance against the council at large and against Gary Johnson specifically with regard his public disparagement of Plaintiff after he left the 09/04/2020 meeting.

99.   That Mr. Johnson publicly stated that he was "out of line" and half-heartedly apologized followed with some idiosyncratic comment about how opinions are what make the USA great.

100.  That during said meeting Plaintiff noticed the council of numerous incidents of police misconduct including Taylor's request of Plaintiff to

acquiesce to him committing a misdemeanor, his dishonesty of there being only one officer on duty at the 09/04/2020 meeting, Taylor's double standard of law enforcement when it involves fellow government workers, and the incident with Collette.

101.  That Plaintiff expressed his first amendment right, including directly criticizing Councilman Don Jacobson, who was witnessed gallivanting around City Hall with brazen disregard to EO-81 and Plaintiff noticed the council of the Collette incident.

102.  That in said meeting another citizen question Johnson as to the evidence relied upon for calling the special meeting on 09/04/2020 to discuss the prior conduct of Heidmann.

103.  Johnson admitted that the council exclusively relied on the incomplete bodycam YouTube videos and statements from Taylor to enact punitive measures against Heidmann.

104.  That later Johnson publicly admitted the whole bodycam footage of the Heidmann incident was not expressed in the YouTube videos, the council had not seen the entire footage, that the council was aware the entire bodycam was selectively edited before it was released to the

media, and that he assumed that Taylor was the one that edited and released the footage to the media.

105.  That in fact Taylor did selectively edit the footage and release it to the media in an effort to smear Heidmann and unfairly affect his chances of re-election.

106.  That in fact the current Prosecutor in the Heidmann matter, Crow Wing County Attorney Don Ryan, who is also refusing to release the entire footage or even the police narrative report of the matter to the public is the brother of the Nisswa City Council mayoral candidate John Ryan (a former Pequot Lakes Police Officer).

107.  That the council, Taylor, the Ryan's, along with select Nisswa employees are actively, unlawfully, and unfairly attempting a coup to remove the mayor through smear campaigns, cover-ups, and election interference.

108.  That upon Plaintiff's questioning as to why Johnson is participating in the cover-up and smear campaign, he publicly stated that "I don't need to answer that and I'm not going to answer that".

109.  Johnson was intentionally and maliciously covering up a motion he in fact made in 2013 to terminate Taylor's employment.

110.  That following The Mayor, Heidmann himself, speaking as a citizen and exposing numerous issues with the police department, the council feigned ignorance at the meeting of the continual issues.

111.  That Plaintiff discovered during the meeting that in June 2020, following social media posts made by Heidmann, that the council called a special meeting in which Heidmann was not present to discuss actions against the mayor concerning the posts.

112.  In the meeting the council voted to have Jenny Max, City Administrator, draft a council code of conduct.

113.  Due to this being meant by the council as yet another smear attempt, moral grandstanding, and lip service to the community, despite having the draft conduct policy, failed to enact it until 10/21/2020 following Plaintiff criticizing them as hypocrites for stalling on it.

114.  That the council addressed and approved updates to the MNGDPA showing they are well aware the law exists; still refusing to follow it by releasing the aforementioned data request.

115.  That on 09/22/2020, during a town hall held at the Nisswa Community Center for the Nisswa election, a flyer was distributed on behalf of John Ryan disparaging Heidmann and Plaintiff, going as far as to claim Plaintiff was a "peach" and a "clown"; with no support other than referring to "Google" for proof.

116.  That by instead Googling Nisswa Police, one can find actual relevant data concerning the constant drama and misconduct of officers from sexual misconduct being covered up by the Chief and his own involvement, to police sergeants feeling under Taylor's leadership it would be appropriate to perform police duties, including driving squads and carrying guns, while drunk.

117.  That on 10/13/2020, while attending the Crow Wing County Board meeting, Plaintiff was unlawfully threatened by Crow Wing Sheriff Captain Joseph Meyer, close friend of Taylor.

118.   Following the meeting outside the board room, in front of Dan Ryan, Meyer claimed that everyone (police) knows that Plaintiff has an "agenda" and that Plaintiff has been travelling through Pequot Lakes and Nisswa giving the "finger" to officers for "months" and had "proof".

119.   This statement is untrue and defamatory.

120.   To date, following an MNGDPA demand to disclose this "proof", Crow Wing County through Sheriff Goddard has failed to provide anything.

121.   Meyer was told this falsehood by Taylor as they play in a music band together and are considered by many as "best friends".

122.   That Taylor has spread this falsehood to law enforcement and others throughout the county of Crow Wing and possibly elsewhere.

123.   This falsehood serves only to harm Plaintiff's reputation and lower the standing of Plaintiff within the community.

124.   That this falsehood spread by Taylor instills great anxiety that others, as many already have, in the law enforcement community will retaliate against Plaintiff due to reliance on this falsehood.

125.  That Taylor intended to spread this falsehood to lower Plaintiff's standing in the community and provoke retaliation, coupled with his unlawful access to Plaintiff's personal information, such that he and others will act on the ill-gotten knowledge where Plaintiff lives and the vehicles he drives; as already happened in the Collette incident.

126.  That prior to 10/15/2020, Plaintiff had made the City of Nisswa aware of all the misconduct, terror, and unlawful acts of Taylor in numerous meetings with the City Administrator and emails, many of which were forwarded to the entire council.

127.  That prior to 10/15/2020, Plaintiff made Nisswa aware of the same via email which many were forwarded onto the council.

128.  That on 10/15/2020 by request from Heidmann, the council held a special session.

129.  During this hearing, Heidmann was trying to convince the council and public that there is a demonstrable need for a third-party investigation of Taylor and the Nisswa Police Department.

130.  In Heidmann's efforts, he posited a question to Councilman Johnson, who was the only member present in 2013, to discuss serious misconduct by Taylor during that year.

131.  Acting as a member of the cabal to continue the coup against the mayor, the ambitious mayor hopeful Councilman John Ryan (former police officer) ran cover for both Johnson and Taylor to prohibit discussion by objecting to the questioning.

132.  To continue the cover-up, the council voted to sustain the objection.

133.  In fact, Johnson in August 2013 made motion to terminate Taylor for gross misconduct (Including marriage infidelity, abuse of the public, and abuse of Nisswa employees) with the council finally voting to extend a severance package which included nearly $100,000 during a temporary suspension of Taylor.

134.  Taylor brought in the union and Nisswa ultimately folded.

135.  Shortly thereafter, Johnson made a public apology and has been serving Taylor's interests since.

136.  Under information and belief, the rest of the council at that time left serving Nisswa as the City was a lost cause; a number other city employees have also left due to the dysfunction.

137.  Immediately following the council's motions, Councilman Hoff lied to the public of being completely unaware that there was any conduct alleged by any citizen's with regard to Taylor.

138.  Hoff was made privy to an email sent by Plaintiff on 10/06/2020 to Nisswa and the entire council explaining in excruciating detail the happenings on and following 09/04/2020 and included prima facie proof of the DPPA violation.

139.  Councilman Don Jacobson, also privy to the email(s) placed Heidmann in an awkward position feigning ignorance of the complaints made by Plaintiff asking Heidmann for proof of "any" misconduct by Taylor and the department when he himself had plenty.

140.  That the council's complete disregard to Plaintiff's experience of Taylor's misconduct and their wanton response to conceal Taylor's misconduct shows not only that Nisswa policy and procedure is

unenforced and meaningless, but Taylor's misconduct also condoned by the City of Nisswa.

141.  That trivializing Plaintiff's (and other's) experiences from the continued gross misconduct to the point of denying it even exists proves that the Plaintiff and public have no redress through the City of Nisswa.

142.  That Plaintiff reasonably believes that Taylor will continue his invasion, harassment, and retaliation against Plaintiff due to the willful inaction and acquiescence of Nisswa.

143.  That in regular dog-piling fashion, Johnson interjected accusing Heidmann of falsely asserting the council is aware of any police misconduct; Johnson's statement was a complete lie as Johnson himself is aware of gross misconduct by Taylor and the department as far back as 2013-Johnson even boldly asserted nothing has been in front of him since he began as a council member along with the prima facie proof of misconduct Plaintiff had supplied the council and city.

144.  Despite ample abuse and misconduct by Taylor and other officers, the council unanimously voted to deny Heidmann's motion to seek a

third party through the League of Minnesota Cities to investigate the chronic and rampant gross misconduct by Taylor and the numerous officers under his leadership.

145.  Following the failed motion by Heidmann, Jacobson disingenuously moved to deny the Mayor's request for investigation due to there being "no" evidence ever presented to substantiate any of the Mayor's claims; the motion was unanimous.

146.  That the entire council denying any knowledge of police misconduct or complaints thereof trivializes the knowledge of the foundation of this action and the acquiescence of Nisswa towards the misconduct Plaintiff previously reported to Nisswa and its council and wanton disregard to the rights of the Plaintiff and in fact the public.

147.  That on 10/16/2020, Plaintiff met at Nisswa City Hall with City Administrator Jenny Max, City Attorney Tom Pearson, and Mayor Fred Heidmann.

148.  Plaintiff spoke in depth of the actionable conduct in this complaint with particular emphasis on how egregious the DPPA violation by Taylor and Nisswa was.

149. That Plaintiff stated that he was certain that Nisswa had a duty to report the violation to the Minnesota Bureau of Criminal Apprehension (BCA).

150. That Nisswa Police Department Policies and Procedures Section 5(I)(A) acknowledges that Nisswa has made a "User Agreement" with the BCA.

151. That this user agreement is otherwise known as the "State of Minnesota Joint Powers Agreement".

152. Said agreement's Par. 9.1 establishes a duty to report to the BCA any violations of unlawfully accessing personal data.

153. From Plaintiff's notice to Nisswa and its council on 10/06/2020, to date, no employee or designee has reported the violation and instead are intentionally hiding the violation from the BCA to protect Taylor with wanton disregard to the law and protection of the public and private data.

154. That on 10/21/2020, Plaintiff attended the regular scheduled Nisswa Council meeting.

155.  On that day's public agenda, Nisswa had scheduled a vote on Agenda E. 9. "Consideration of closed session at end of meeting pursuant to MN Statutes 13D.05 subd. 3(b)-Attorney-Client Privilege Threatened Litigation (Council Action-Motion)

156.  That E. 9. was concerning the issues raised by Plaintiff to City administration, council, and City Attorney; including but not limited to the DPPA violation.

157.  Plaintiff again spoke in exercise of his 1st amendment right to express not only a personal grievance, but also notice the public of the malfeasance of Nisswa.

158.  But for Plaintiff exercising his right, Nisswa City Attorney Tom Pearson recommended the council cancel the vote on E.9. as it was clear to him and the council that as Nisswa had been doing since at least 2013, they were not going to be able to conceal their misdeeds from the public or even address transgressions by Taylor against the public.

159.  The council voted unanimously to cancel consideration of the closed session in retaliation of Plaintiff exercising his 1st Amendment right.

160. That by the actions of both Nisswa, its City Attorney Tom Pearson of Gammello-Pearson Attorneys at Law, and its council, they manifest their intent to be complicit in not only the federal and state privacy crimes committed by Taylor's unlawful access of Plaintiff's private data, but also the concealment of those crimes.

161. That Plaintiff finally concluded that to be made whole and also perform his civic obligation to keep the underlying causes of action in this instant complaint public, that he would need to proceed with this instant lawsuit.

162. The council voted to approve Agenda Item F.1. "City Council Code of Conduct Policy" as further lip-service to the public as they made it clear in the meeting that they didn't need to sign it or were necessarily obligated to follow it.

163. When asked by Plaintiff if any intended to sign the document, they refused to answer.

164. That Nisswa continually exercises clear evidence that they are uninterested in enforcing existing policy, changing policy, adding to

policy, or even following policy in relation to each and every claim brought in this instant suit and generally.

165.  That following Plaintiff's accusations exposing the misconduct of Taylor and the Nisswa Police, former Nisswa Councilman Lenny Hodgson, who resigned from the council in 2013 after the failure to remove Taylor, spoke.

166.  Hodgson was replaced in 2013 by appointment of Crow Wing Sheriff Capt. Joseph Meyer as councilmember and was assigned as "liaison" to Taylor; this while the council was fully aware the two were personal friends.

167.  Hodgson validated the assertions made by Plaintiff, stating that he was on the council during "some of the incidents" and misconduct Plaintiff noticed the public via addressing the council, proving the council is invested in concealing the misconduct concluding, "It is just amazing to me, how you (Plaintiff) can know *so* much (of the incidents surrounding 2013)..."

168.  Hodgson stated, "I remember this, some of this from years ago, and uh, the names have been changed (of the council members), but the

behaviors haven't necessarily been changed (dysfunction within the council)".

169.  That around the same period Hodgson resigned over the Taylor matter, so too did the City Attorney Clyde Ahlquist, Councilman and Mayor Harold Kraus, Councilwoman Tina Foster, and Councilwoman Jan Pierce.

170.  That despite numerous warnings of legal action, Nisswa and Taylor continue to disregard the law and Plaintiff's rights.

171.  That Plaintiff suffers from Post-Traumatic Stress Disorder, Insomnia, and Anxiety with Panic Disorder which were severely exacerbated by the actions of the defendants.

172.  Plaintiff suffered severe emotional distress by the actions of Nisswa, Taylor, and Collette.

173.  Plaintiff realleges and reasserts each and every averment and statement of fact above, into each and every claim set forth below.

## CLAIM I: FOURTH AMENDMENT: SEIZURE OF PLAINTIFF'S PERSON (42 U.S.C. § 1983)

174. Defendant Collette, in his individual capacity, acting under color of law, unreasonably seized Mr. Scheffler's person from the outset, without warrant, probable cause, arguable probable cause, exigent circumstances, or any other lawful exception to the warrant requirement.

175. That Collette did park his patrol vehicle knowingly obstructing the free travel of Plaintiff.

176. That Collette did unlawfully park and impede and seize Plaintiff with the intent to unlawfully impede, harass, and interrogate Plaintiff.

177. That Collette did in fact interrogate Plaintiff.

178. That Collette clearly stated his reason for the interrogation was based on "curiosity".

179. That Collette admitted that he had no lawful reason to have impeded and seized Plaintiff as he conceded the prior behavior he alleged to have witnessed of the Plaintiff was in fact completely legal.

180. Defendant Collette inflicted damages upon the Plaintiff in excess of $75,000.00, or a sum that the jury must determine.

181. That Taylor is the final supervisory official of Collette and has shown a history of deliberate indifference and widespread abuse towards hiring, training and supervising his officers.

182. Plaintiff seeks punitive damages.

183. Plaintiff suffered extreme emotional distress.

184. Defendant Collette manifested callous or reckless indifference, or intentional disregard to Mr. Scheffler's clearly established right to be free from unreasonable seizure of his person under the Fourth and Fourteenth Amendments to the United States Constitution, for which 42 U.S.C. §§1983 and 1988 furnish remedies.

185. Plaintiff seeks damages jointly and severally, from Defendants Nisswa (*Monell*) and Collette for this claim.

## CLAIM II: COMMON LAW FALSE IMPRISONMENT

186. Defendant Collette, in his individual capacity, acting under color of law, did in fact imprison Plaintiff without probable cause or legally justifiable reason.

187. That Collette willfully, intentionally, and otherwise knew his conduct would serve a substantial certainty that Plaintiff would in fact

or otherwise reasonably believe that he was detained and bounded to the area in which Collette had stopped and ultimately placed his vehicle into park as he relinquished control of the vehicle creating a barrier as he exited his vehicle to question Plaintiff.

188. That Plaintiff clearly expressed to Collette that he did not in fact consent to the detention and demanded numerous times for Collette to allow him legal free travel.

189. That Plaintiff lacked any reasonable means of escape without risk of life and limb and/or violating clearly established law.

190. That Plaintiff had the reasonable belief that due to the fact that both Collette and Taylor were present at the 09/04/2020 council session that Collette's actions were in fact retaliatory to Plaintiff exercising his Constitutional rights and Plaintiff reasonably believed that if he attempted escape in a manner contrary to State law that Collette would retaliate by charging him with violation of law.

191. That the detention of Plaintiff was unlawful.

192. Defendant Collette inflicted damages upon the Plaintiff in excess of $75,000.00, or a sum that the jury must determine.

193. Plaintiff seeks punitive damages.

194. Plaintiff suffered extreme emotional distress.

195. Plaintiff seeks damages from Collette.

### CLAIM III: The Drivers Privacy Protection Act (18 U.S.C. § 2724)

196. Defendant Taylor in his individual capacity acting under color of law and City of Nisswa, acting under color of law, in fact violated protections afforded to Plaintiff under the DPPA.

197. That on 09/04/2020, at 5:17PM, Taylor and Nisswa did unlawfully use their security access with the MN BCA and DPS(DVS) to invade Plaintiff's personal information data held by his Minnesota Motor Vehicle records

198. This data included, but was not limited to, Plaintiff's photograph, driver identification number, name, address, and disability status.

199. That Taylor did in fact unlawfully access FBI, NCIC, and CJIS restricted data centers by using a name search.

200. That said defendants willfully obtained, accessed, acquired, and misused the data for an improper purpose.

201.  That Plaintiff did not consent to these searches.

202.  That Taylor shared the unlawfully accessed data to others.

203.  That Nisswa (and Crow Wing County) has previously been sued a number of times for unlawful access under the DPPA while Taylor was Chief in at least *Myers v Aitkin County, et al* (US Dist Ct. 14-473, 2014) and *Gavin v Anoka County, et al* (US Dist. Ct. 14-615, 2014).

204.  That Taylor accessed the data in retaliation to Plaintiff exercising his Constitutionally protected rights specifically enshrined in the 1st Amendment.

205.  That the accessing this data is a crime.

206.  That Nisswa, its council, and administration have been complicit in this criminal act and has to date failed to report the unlawful access to the BCA as agreed to and instructed by the actual "User's Agreement" referenced in Nisswa Police Department Policies and Procedures Section 5 (A).

207.  That said "User Agreement" states in relevant part, "When Agency becomes aware that a violation has occurred, Agency will inform BCA

subject to any restrictions in applicable law." (State of Minnesota Joint Powers Agreement Authorized Agency Par. 9.1)

208. That Nisswa and its council has done everything in their power to cover-up, deny, and lie to the public concerning this and other actionable conduct performed by Taylor.

209. That Taylor and Nisswa were aware of the 01/2011 (Again adopted in 08/2020) "policy" against unlawful access and willfully violated said policy.

210. That Taylor and Nisswa show a deliberate disregard to the rights and privacy of the public and specifically Plaintiff.

211. That Nisswa and Taylor have a consistent disregard towards policy and discipline of violation of policy making city policy meaningless.

212. Plaintiff is terrified that now Taylor and other police officers have his private data that they will continue to retaliate against him.

213. Plaintiff is terrified Taylor was, has, and is going to use the data he breached to stalk and harass Plaintiff.

214. Plaintiff seeks at least $2,500 in liquidated damages, but in excess for actual damages.

215. Plaintiff Defendants Taylor and Nisswa inflicted damages upon the Plaintiff in excess of $75,000.00, or a sum that the jury must determine.

216. Plaintiff suffered extreme emotional distress.

217. Plaintiff seeks punitive damages.

218. Plaintiff seeks damages from Taylor and Nisswa jointly and severally with regard to this claim.

## CLAIM IV: COMMON LAW INVASION OF PRIVACY/INTRUSION UPON SECLUSION

219. Plaintiff's private and restricted data was intentionally and without authorization was invaded by Taylor, in his individual capacity, while acting under color of law.

220. That Taylor without any permissible purpose invaded Plaintiff's private data including, but not limited to Plaintiff's photograph, driver identification number, name, address, and disability status.

221. That Taylor unlawfully accessed Plaintiff's private data held within FBI restricted databases.

222. That Plaintiff did not consent to these searches.

223. That a Chief of Police Accessing Plaintiff's data which includes what he drives and where he lives and in retaliation to Plaintiff exercising his 1st Amendment rights is highly offensive.

224. The private data unlawfully gained was private data secured by security clearance.

225. Plaintiff seeks punitive damages.

226. Plaintiff seeks damages for extreme emotional distress.

227. Plaintiff Defendants Taylor and Nisswa inflicted damages upon the Plaintiff in excess of $75,000.00, or a sum that the jury must determine.

228. Plaintiff seeks damages from Taylor with regard to this claim.

## CLAIM V: COMMON LAW DEFAMATION

229. Defendant Taylor did invade Plaintiff's personal data.

230. That Defendant Taylor did retaliate against Plaintiff for exercising his constitutional rights.

231. Defendant Taylor spread false accusations that Plaintiff was travelling around both Nisswa and Pequot Lakes "for months" giving the middle finger to police officers.

232. Defendant Taylor spread this and other untruths verbally to others including but not limited to, Nisswa Police Officers and his personal friend Capt. Joseph Meyer of the Crow Wing County Sheriff's Department who in turn spread the defamation to the Sheriff himself, Scott Goddard.

233. That under information and belief, Taylor made defamatory statements to others in writing, including, but not limited to, Nisswa Police Officers.

234. That these false and defamatory statements were fully intended by Taylor to smear and harm Plaintiff's reputation and to lower him in the estimation of the community and its police.

235. That Taylor's intent was to instill hostility of the public against Plaintiff as he has repeatedly done to others under false pretenses.

236. Defendant Taylor inflicted damages upon the Plaintiff in excess of $75,000.00, or a sum that the jury must determine.

237. That Plaintiff seeks Punitive damages.

238. Plaintiff seeks damages from Taylor in his individual capacity with regard to this claim.

## CLAIM VI: 1ST AMENDMENT RETALIATION (42 U.S.C. § 1983)

239. Defendants Taylor, in his individual capacity, and Nisswa, under color of law, acted in retaliation to Plaintiff exercising his 1st Amendment Rights.

240. At all times in this instant suit, Plaintiff has acted in lawful and protected conduct.

241. That speaking at Nisswa Council meetings during the public forum is protected conduct under the 1st Amendment.

242. That all claims made in this instant suit had the impetus of retaliation towards Plaintiff speaking at Nisswa Council Meetings during public forum.

243. That the retaliation has manifested in Councilman Johnson making disparaging remarks about Plaintiff after he left a meeting, Chief Taylor invading Plaintiff's private data, trivializing and lying about the existence of complaints of misconduct made to the council and city

administration, cancelling of scheduled agenda items in retaliation for Plaintiff continuing to express his grievances, refusing to disclose public records in retaliation of Plaintiff's continued exercise of his 1st Amendment, Taylor instructing his officers to treat Plaintiff in a manner more poorly than if Plaintiff did not exercise his 1st Amendment, Nisswa Police retaliating in actionable conduct such as the Collette incident, and Taylor's continued defamation of Plaintiff.

244.  That such retaliatory conduct in individual instances and taken as a whole would serve to deter a person of ordinary firmness from continuing to exercise their Constitutional Rights.

245.  That such conduct serves to deter the free exercise of Constitutional rights.

246.  Defendant Nisswa and Taylor inflicted damages upon the Plaintiff in excess of $75,000.00, or a sum that the jury must determine.

247.  Plaintiff seeks punitive damages.

248.  Plaintiff seeks damages jointly and severally from Nisswa (*Monell*) and Taylor with regard to this claim.

## CLAIM VII: MNGDPA (MN Stat 13.08)

249. Defendant Nisswa has unlawfully withheld material data in Plaintiff's peace of mind with regard to the circumstances surrounding the Heidmann arrest and has prohibited Plaintiff's ability to express the data to the public and in grievance to the City of Nisswa otherwise interfering in Plaintiff's civic duty to remain vigilant with his government and his social contract with his fellow citizens.

250. That Taylor admitted to Plaintiff that he was the Responsible Authority Designee for data requests concerning the police department.

251. In the same conversation, Taylor expressed hostility towards Plaintiff's inquiry towards public data stating that he would not release lawfully mandated data if he felt "bogged down" by such requests.

252. On 09/08/2020, among other requests, Plaintiff made an MNGDPA demand to the Nisswa Clerk and Taylor as responsible authorities stating, "…please disclose the body cam, squad camera, or any other note, report, or recording held by the City of Nisswa involved in the arrest of Mayor Heidmann and the stop of the individuals which was the underlying cause of his intervention.  Please disclose the recording system used by your patrol vehicles and body cameras such as ICOP etc.".

253. To date, Nisswa and Taylor have nor released a shred of data demanded.

254. That Nisswa and the Nisswa Police are not the charging or prosecuting authority in the Heidmann arrest.

255. On 10/02/2020, Plaintiff received an email from Nisswa's City Administrator Jenny Max stating, "Nisswa Police Department uses WatchGuard for its recording system. Your request for documentation involving the arrest of Mayor Heidmann has been forwarded to the City Prosecutor for review.  10/02/2020 Update: We have attempted to refer this request to prosecution to understand active investigation prohibitions to data requests that might apply, but no court file appears open yet, so no active prosecution as we understand it. Once there is, if there is, we will complete that communication and then attempt to complete the answer to this data request as best we can."

256. Crow Wing County Court records concerning State v. Heidmann Case No. 18-CR-20-2969 clearly show that charges were filed 09/02/2020.

257. That Plaintiff has been thwarted and stalled by Councilman John Ryan's brother Crow Wing County Attorney Don Ryan in requests made directly to his office as prosecutor of the case.

258. Don Ryan has assured Plaintiff numerous times he would respond to the demand and not once exercised the courtesy and legal obligation to respond.

259. That Nisswa and Taylor have not responded in compliance with MN Stat. 13.03, Subd. 3.

260. That the bodycam footage held by Nisswa is not "investigatory data" as they are not actively engaged in or ever will be engaged in investigating the Heidmann matter nor are they the prosecuting agency or charging agency.

261. That Taylor has already released a material portion of the bodycam footage Plaintiff demanded making the data de facto public and not protected as "investigatory data" to maintain the integrity of or jeopardize a prosecution.

262. That the police report was already released to the media prior to September 1st, 2020.

263. That all data demanded by Plaintiff as applied under MN Stat. 13.82, subd. 2,3, and 6 is unambiguously public data which was not released by Nisswa.

264. That Nisswa has record of the Citation issued to Heidmann which otherwise is not protected data as it was evidence presented to the Court on 09/02/2020.

265. That under information and belief that Nisswa, its council, and Taylor are maliciously and unlawfully withholding and concealing the data so as to interfere with Heidmann's mayoral election campaign.

266. That Taylor's actions constitute a crime under MN Stat. 13.09.

267. Plaintiff seeks compensatory damages.

268. Plaintiff seeks exemplary damages in the amount of $15,000.

269. Plaintiff seeks mandamus relief in mandating the release of the above-mentioned data per Minn. Stat. §13.08 subd. 4.

270. Plaintiff seeks nominal, special, general, and exemplary damages from Nisswa with regard to this claim.

## CLAIM VIII: 4th AMENDMENT UNLAWFUL SEARCH (42 U.S.C. § 1983)

271. Defendant Taylor, in his individual capacity, and Nisswa, acting under color of law, unreasonably searched Plaintiff's private and protected data from the outset, without warrant, probable cause, arguable probable cause, exigent circumstances, or any other lawful exception to the warrant requirement.

272. Defendants Taylor and Nisswa, under color of law, acted in retaliation to Plaintiff exercising his 1st Amendment Rights.

273. At all times in this instant suit, Plaintiff has acted in lawful and protected conduct.

274. That Taylor violated the DPPA and other data as addressed in Claim III by his unlawful search.

275. That Plaintiff had committed no unlawful act and Taylor had no other reasonable purpose to search Plaintiff's private data.

276. Defendant Nisswa and Taylor inflicted damages upon the Plaintiff in excess of $75,000.00, or a sum that the jury must determine.

277. Plaintiff seeks punitive damages.

278.  Plaintiff seeks damages jointly and severally from Nisswa (*Monell*) and Taylor with regard to this claim.

## CLAIM IX:

## *MONELL* AND MUNICIPAL LIABILITY TOWARD'S NISSWA

## (CLAIMS I, VI, VIII)

279.  That following the failed removal of Taylor in 2013, Nisswa by pattern and practice has allowed the police full reign to run riot by failing to hold Taylor accountable for gross violations of the public and the public trust which culminated in his and his officer's actions against Plaintiff.

280.  That Nisswa has refused to dictate, establish, or enforce policy making it meaningless and void and rather has endeavored to lie, mislead, and conceal gross violations towards the public and Plaintiff by the police and Taylor.

281.  That Nisswa has shown a deliberate indifference to the misconduct of Taylor.

282.  That Nisswa has been grossly negligent in the hiring, training, and disciplining of Taylor and by proxy the rest of the department under his supervision.

283.  That Nisswa operates under a de facto policy of tacit approval of the misconduct of Taylor and subsequently Taylor extends that policy to his officers with regard to abuses against the public and public trust.

284.  That Nisswa has consistently covered for and failed to adequately discipline Taylor as evidenced by the absurdly common and consistent gross misconduct exhibited by its officers under the "leadership" of Taylor as a Police Chief while leaving him in a leadership position.

285.  That Taylor has clearly established a persistent pattern and pervasive custom and culture of officer misconduct which Nisswa shows a deliberate indifference to.

286.  That this reckless disregard towards the rights and safety of the public have manifested within a Police Department of merely six officers expressed in <u>at least</u> the incidents of: Sergeant Rothwell appearing drunk numerous times on duty and carrying a firearm with the city and Taylor failing to enforce DWI laws against his fellow

officers despite operating a Nisswa patrol vehicle (Rothwell in one of the incidents tested at .17 BAC); Officer Lasher quitting the department due to the dysfunction and gaining employment with Crow Wing County; Taylor violating MN Stat. 609.36 (Adultery); Officer Boelter committing numerous incidents of sexual impropriety while on-duty and the city covered it up by claiming discipline over using a city cell phone for personal use (Taylor later publicly stated Boelter was a "valuable asset to the community" upon Boelter's resignation); Countless complaints by city employees and citizens of intimidation and bullying by Taylor which Nisswa chose to cover-up; Sexual misconduct with a disabled woman; Conning other police and cities into liability due to Taylor's inability to do his own job leading to lawsuits against other cities and police officers as exhibited in *Christensen v Klang* (US Dist. Crt. 20-cv-00565, 2020); Taylor's suspension in 2013, numerous DPPA violations resulting in multiple suits, and of course the conduct Plaintiff experienced by the department.

287.  That as evinced with the Rothwell incident and the failure to hold Rothwell criminally accountable as Taylor would any other citizen, Taylor is uninterested in holding his officers accountable for misconduct

to any degree which would be a deterrent as his responses are not in the

best interests of the public, but rather in response to his own public

scrutiny.

288.  That Taylor has shown a pattern of bullying, double standards

with regard to public safety and arrests, and invasions of privacy that

Nisswa refuses to discipline him for or even acknowledge as shown in

their consistent pattern of lying to the public about their Police

Department's and Taylor's misconduct and dysfunction as stated supra.

289.  That Nisswa exercises a persistent willful blindness over the

actions of the police department and Taylor as evinced in their lack of

knowledge of the particulars of many circumstances surrounding the

department and their hostility towards Mayor Fred Heidmann's

pursuit, persistence, and insistence to simply look into finding a third

party to investigate the publicly declared and the covered-up

misconduct of Taylor and the department from 2013 to the present.

290.  Since 2013, Nisswa has conceded any will to discipline Taylor or

hold him accountable to any policy with particular emphasis to broken

policies Nisswa was made aware of by Plaintiff.

291. In its failures, Defendant Nisswa has been deliberately indifferent to the rights of citizens, and these failures and policies are the moving force behind, and direct and proximate cause of, the constitutional violations suffered by Plaintiff as alleged herein.

292. As a direct result of Defendant Nisswa's failures and policies as described herein, Plaintiff suffered damages including severe emotional distress, loss of liberty, fear, apprehension, concern for Plaintiff's own safety, and harm to his reputation in the community.

293. Plaintiff seeks nominal, special, general, and emotional distress damages, from Nisswa.

### PRAYER FOR RELIEF

Wherefore, Plaintiff prays for the following relief:

A.    Judgment against the Defendants jointly and severally;

B.    Compensatory damages against the Defendants, in excess of $75,000.00, or such sum as a jury may award;

C.    Punitive damages against the Defendants, in excess of $75,000.00, or such sum as a jury may award;

D.     Reasonable attorney fees;

E.     Costs and disbursements;

F.     Preverdict interest;

G.      Mandamus Relief;

H.     Prejudgment interest;

I.     Trial by jury; and

J.     All other legal, declaratory, or equitable relief appropriate under

the circumstances.

## DECLARATION

In accordance with 28 U.S.C. §1746, in Crow Wing County, Minnesota, I,

Troy K. Scheffler, declare under penalty of perjury, that the above-stated

averments of fact, after diligent inquiry, are true to the best of my present

knowledge, and that identification of discrete claims and citations to

sources of law are furnished to me for ease of identification of each of my

claims.

Date: 10/26/2020

Troy K. Scheffler
26359 Shandy Trl
Merrifield, MN 56465